May it please the court. This case is probably best thought of as five different claims. There are four claims by the four Higgins plaintiffs indicating that they on June 20 of 2009 were admitted to the emergency room after they were exposed to chlorine gas. And then there's a fifth claim by Mr. Kent Higgins where he continues to claim that he has reactive airway dysfunction syndrome, RADS, as a result of that 2009 exposure. The district court granted summary judgment on all of the claims and in rejecting the argument that expert testimony was unnecessary for at least some of the claims it held where someone is claiming a permanent injury such as asthma, then expert testimony is necessary to prove the causation. Now I think that is true when you're talking about a permanent injury. When you're discussing an ER admission the day of the exposure, I don't believe expert testimony is necessary. In our point on that issue compared to their cases which generally refer to people alleging they have suffered permanent injuries as a result of a chronic exposure to a chemical. Now in this case the district court even cites Mr. Higgins nursing flow records from the emergency room admission that day which states Mr. Higgins is experiencing symptoms such as burning in the eyes, chest tightness, vomiting, nausea. No one disputes that those symptoms arose as a result of the chlorine exposure. The dispute is whether he is still suffering symptoms to this day as a result of that exposure. Even their expert testified, I do believe your clients had irritant health effects but they weren't permanent. 40 persons, 40 to 50 persons were admitted to the hospital that day from exposure to chlorine. On this record, and the defendant admitted liability which also needs to be pointed out, on this record the district court at the least committed error in entering summary judgment on all of the claims. At most, assuming it's ruling on the expert was correct, which I don't think it was and I'll get to that, but even if it's ruling on the expert was correct it should have granted partial summary judgment. The plaintiff does not need to show permanent injuries to recover under Indiana law and the other point I'd make on this is certainly Dr. Hack's opinions regarding the immediate effects of the injuries would be reliable. Now on the issue of the experts testimony, I believe the district court committed some errors of law in imposing some legal requirements that don't exist and certainly do not exist to the extent suggested in the order. First is, a plaintiff is not always required to prove the exact amount of exposure. In the cases we cite on this... Yeah, but the big problem the court had here was this diagnosis didn't come until a year after the event. Other factors could have come into play. The witness that was called really didn't have an expertise in this area. The impact of the gaffe didn't, so I mean that was really the essence of the judge's concern. Sure, and let me address that. This expert's diagnosis didn't come until a year later because she first saw our client more than a year later, but what she did is she referred back to records from at least August of 2009, maybe even closer to June of 2009, where the previous doctor had done a pulmonology study. She had some data at the time of her first diagnosis. The order makes you think that she never had the results of that first pulmonology study. She certainly did. If you read the entirety of her deposition, it is clear she did ultimately have the first pulmonology study and then she did her own to compare it to. And her diagnosis, by definition, requires exposure to an irritant. That is what RADS is. There's a lot of discussion in the order and then in Apelli's brief that we can trust doctors to make diagnoses, perhaps, but oftentimes doctors don't have the rigor that's required to form a causation opinion. That is sometimes true, but here we have a diagnosis that is tied into causation. It's reactive airway dysfunction syndrome and she testifies in her deposition that by definition it an expert be familiar with the specific chemical that was involved. The defendant elicited testimony from her that she has 20 years of experience treating RADS and asthma. She has the experience to make all of that treatment. Her conclusion that chlorine could cause this is not controversial. In fact, there was an MSDS that was in the record. Their own expert referred to the MSDS. There's no controversy as to the general causation. And the other point on that, the requirement that she have knowledge as to chlorine, that almost reads as though the order is suggesting she has to have superior knowledge. It's actually not clear. It says she does not have superior knowledge. It begs the question, superior to whom? The case law makes clear that for an expert's testimony to be helpful, it needs to be superior to a layperson. Well, she has 20 years as a board-certified pulmonologist treating RADS, treating asthma, so she certainly has the qualifications to make the diagnosis. What is the state of the record with respect to the pulmonologist's knowledge of any other pulmonary impairment or episode that the plaintiff may have had prior to her seeing? Right at the scene? No, prior to her seeing here. Sure. If you look at her August 18th... Let me get that for you. Just so I can direct you to where this would be in the record, but it's her August 18th, 2010 letter. That's her first visit where she's writing a letter back to Dr. Zaman. And in this court, it's document 50-5, appears on page 401. In the district court, it was document 208. She writes, prior to the exposure, he has had no respiratory symptoms at all and no history of any kind of respiratory- related problems, including asthma. She then goes on on page 2 where she goes through social exposure history. And she writes, he is a lifetime non-smoker and has not exposed to secondhand smoke. The patient works as a contractor for telephone cable company. He denies any significant occupational exposure. So remember, her diagnosis is RADS, so caused by an irritant. And then she's looking at, what other irritants could he have been exposed to? So she's eliminating other causes. Exactly. And she's not required to eliminate every conceivable cause in the world, but just the, you know, causes that would be germane to our diagnosis. And she does that. This fellow had no other respiratory episode, nor was he exposed to any of those things which might cause a respiratory episode. Correct, correct. And, but he did have this. He did have this. And the factors the defendant is pointing to aren't really germane to RADS. They might be, if we're talking about generic asthma, but not RADS. Example, they talk about, well he's overweight, which she denies that actually has much to do with asthma at all. But even if it did, that doesn't affect RADS. So the factors they're deposition explains why those aren't germane to her, why they don't affect the diagnosis. The RADS presents itself clinically in the same way as asthma, does it not? It's fairly close, but then that's why you go to the pulmonology studies. And there's a lot of discussion in the deposition about, does he have a restrictive problem or an obstructive problem? The obstructive would lead more toward the RADS. Restrictive would be more in a these other conditions. And she goes through why she thinks he has both. And for the restrictive point, she concedes that him being overweight could affect that, but she says there's also an obstructive component and that flows back to the RADS diagnosis. So this idea that she's not considering any of his pre-existing conditions, I think that's contradicted by the record. Want to save a little time for rebuttals? Yes, I do. Ms. Rowe. First thing I'd like to do today, I represent obviously the epile in this case, but I want to focus a little bit on what was just said. I think when we talk about the other claims, the kids claims, I think all that has been waived in this case. It was never raised at the trial court level as an argument. It's just been raised, to my knowledge, right here today. In what claim, I'm sorry? The claims of the other people besides Mr. Higgins. I see. The other four or the other three persons. I think that has all been waived. I also think some things that was said today is not in the record, so I urge the court to look just in the record to see what was there. But I think the issue here is the focus on the temporal component. That's what the time, the fact that there was an exposure. Granted, he wasn't in the area of the exposure at the time it occurred. That is an undisputed fact in this case. He was nowhere in the vicinity of the exposure. He came back because he received a phone call and he came back to the area worried about a relative. And there's also no dispute in this case, obviously, that a release did occur and the people did go to the hospital afterwards. To our knowledge, no one complained of persistent symptoms. Everybody was just treated and released, as was Mr. Higgins. And then he came back, like I said, a year later, he talks about. One thing that's interesting when you talk about Dr. Hackey's studies, when she first saw him a year after this incident, she did, all she had was the pulmonary results from the previous doctor. She did not have any of the underlying data and she talked about how that underlying data is important. She didn't have any of that. She never, when it comes to his prior medical history, all she had was his self-reporting. She never did anything in addition to that and I think that's the distinction. That's why we make the distinction. That's why, frankly, the case law makes the distinction about diagnoses and causation. Doctors are routinely making diagnoses and they routinely do that based on the self-reporting of the patient. Causation is something a little bit different. It's an external causation and usually that's why we look for something a little bit more. And in this case, this is a toxic tort case. The Higgins's have to prove for their negligence, they've got to show proximate causation. To do that, they need expert testimony. We believe that Indiana state substantive law would apply on the context of whether expert testimony is needed, but there's been an issue raised about whether it should be a federal procedural law that applies. And in our view, it doesn't matter because both laws are the same. They both require the Higgins's to show both a general causation, showing that, for example, the dose of chemical that Mr. Higgins was exposed to could cause RADS, but they also have to show a specific causation, which shows that in this toxic tort type environment and it shows that the actual dose he received did cause his RADS. So your position is that you have to have the exact amount of chlorine in order to determine, I mean, so you could actually theoretically have an expert who couldn't quantify the amount of chlorine, but you're saying the key is the exact amount of exposure or Higgins can't succeed? That is sort of what I'm saying. I think that if in the event where you don't have the exact amount, and I think this is consistent with the RADS cases that they raise, in the event that you don't have the exact amount, you have something that their doctor says is required and that is substantial. There's no dispute that there's a substantial amount. For example, in some of the cases, the chemical actually spilled on the person and then they would look at the, oh, the MS, the material data sheet and they would look at that sheet and say, okay, this is really a small concentration. So the fact that you actually received a huge dose, it's undisputed that was massive. Then they may not know the actual quantity, the actual number, and I think in those cases it was okay because, again, it was undisputed that the patient had received a substantial dose. Here, if you look at the reply brief especially, it seems like the Higgins's are saying, look, chlorine is just dangerous. It's just a dangerous product and so any dose is fine, but that's not what their doctor says. Their doctor, every time the doctor has stated, and I've got this quoted, I want to make sure I get this right. She says a large amount of muriatic acid or this chemical, a massive exposure. She always quantifies it in a way of, she always qualifies it. She says that it has to be a significant amount. She then says, basically, it all comes down, and I'm quoting her at this point, it all comes down to how much did he actually receive, how much did he inhale. So it's not just any exposure that's going to do with a chlorine or this chlorine gas. It's got to be a significant or substantial amount, and that's what we dispute. The doctor, in this case, did not know because, again, she's going solely on self-reporting. She thought it, you know, if you look at her letter, she thought it was a work-related accident. This had nothing to do with his work. This was just, you know, he was there for a Boy Scout troop. So there's some errors in the self-reporting, but she says every time it's not just any dose that's going to do. It's got to be an amount of dose. She uses the word significant dose because that's what he told her, I received a significant dose. She doesn't know. She says, you know, for purposes of my diagnosis, I didn't care how much he received. I'm treating his symptoms. I'm looking at what his symptoms are, and I'm saying, okay, what's going on? I think you have RADS. I refer to it as RADS, but, you know, I think you have that issue, and from that point, I'm going to start treating you this way. So the lens she was using was in a treatment mode. Correct. In fact, I think it's a great point, Judge Williams, because what happened in this case, if you look at the procedural posture of this case, you know, now they're complaining about, oh, we don't, we didn't, we don't think we need an expert, but they've always known they needed an expert. They actually had an expert. They had Dr. Margarita. They had an expert come in. He was excluded. Then our motion for summary judgment was filed, and then, in the response, was the very first time they've ever said, sometime in the interim, before I get to the response of the summary judgment, sometime in the interim, they deposed their doctor. We've never had the opportunity to depose their doctor. They deposed their doctor, and when they did that, we cross-examined her, but it was on a very limited basis, because all we had really was the letter, a two-page letter, which is at the record at 175-1. And at the time that that happened, had she been designated as an expert? She was not designated. She was a treater. Absolutely, Your Honor, and in fact, there was a question, there was one question in the deposition that kind of hinted at causation, and we immediately objected, and we said, she's not a causation expert, and the response, which I think is critical, wasn't, oh yes, she is, or we've already designated her, or yes, she is. The response was, well, she can talk to rebuttal. She can rebut your, because she was discussing our expert, and she says, you know, she can, she still has the right to rebut what your expert said. So at that point, it was in no way that she was going to be their expert. In response to our summary judgment, which their response was about two weeks before the trial was scheduled in this case, that's when they first said, not only that she was their expert, but also that she had done this differential, they say diagnosis, I think the correct term would be etiology, is how she had, that was her methodology, that's what they said she did. The plaintiff was seen in an emergency room immediately after the exposure, is that correct? That is correct, that is correct. Are the records of that emergency room visit in the record? They are, they are in the record. And what do they say? They say he was, I think they diagnosed him with a mild exposure, and it said that he had vomited. They say that he was in the Lazy River, which is not, this is a Lazy River attraction, when I say Lazy River, it's a water park, and this was the open-air attraction that they had there where this release occurred, and they say he was in the Lazy River, which is not true. He was actually, and that's undisputed at this point, I mean he was actually leaving the park at the time, but he was nowhere in the vicinity of the Lazy River. The local establishment treated him for exposure to this gas immediately later, afterwards, and that he did exhibit symptoms. That is correct, that is correct. So you do know that? We do, and I think it is true that there were probably 40 others, I'm making up that number, I'm not sure if that's the correct number, but there were other people, I mean there was a release that occurred and people did get sick, but it was something for everybody except for one. The diagnosis in the emergency room was what? Mild exposure is what I want to say. Mal exposure? Mild, M-I-L-D. Mild exposure. Yes. You mentioned an expert... One thing I'd like to mention before my time is up is the flawed methodology here. You know we talked about how, or they talked about how the doctor has ruled out all these things in her letter where she talks about smoking, but one thing that in her deposition when she's actually talking about the rad's in, one it could be a massive exposure, again she always quantifies that, and she also admits that it's the plainest history of upper illness, respiratory illness, like your bronchitis, things like that, that could eventually develop into rads. And she admits that she knows he has a long history, again she's going on his self-reporting, but apparently he has a long history of upper respiratory illness, which is bared out in his records. And she said what that they could lead to. They could develop into rads. That's what her deposition is. That would be, that would that would mean that rads is not limited to sudden traumatic exposure. That is correct, your honor. This is her testimony and I want to just give the court the record site for that just in case, but it's in the underlying docket at 182-2 at page 45 of her deposition. Say that again. It's 182-2, it's like exhibit 2 of that, and it's page 45 of her and she says she admits, I mean she's being questioned, but she admits that a patient having a long history of upper respiratory illness, like bronchitis, sinusitis, things like that, could eventually develop into rads. And how extensive was his history? I know, I understand it was self-reported. What did she write down or indicate? I don't want to tell you incorrectly. I don't want to make up something. I know she says it was a long history. I think we had the records. This was in response to our questioning. We had the records, so we knew that he had a long history. He was on, it started because he was on a lot of drugs, a lot of like prednisone and drugs for upper respiratory illnesses, especially in the, I'm thinking the three to six months prior to this exposure, and we were saying what does that have to do? And at first the doctor seems to be suggesting that it's separate because it's upper respiratory as opposed to rads being in the chest, and then she admits that it could develop into that, but she never rules that out. She never discusses that other than that one time. And these records, those records were available to the court, his prior medical history records, or that was part of what you cited in your argument? I believe that's part of what we cited. It's definitely part of the record, this part of the thing, and to the extent that rads is consistent with asthma, she also talks about obesity. She talks about reflux. She talks about possible sleep apnea. At that point she didn't know if he had it. She was testing him for sleep apnea, but she never rules out any of these other things. She just goes to and says it was this massive exposure, which again, the massive part is coming from his reporting. Thank you, Your Honor. Appreciate your time. Thank you. Counsel? Let me start with, real briefly, on this Rule 26 issue. Actually that was responded to in the summary judgment responses where we pointed out, well actually we disclosed this August 18, 2010 letter a long time ago. The other thing that's interesting is when they excluded Dr. Margarita, they were disclosure for him, and what they said at that time was that defendant makes no objection to the inclusion of Dr. Hackey, the expert here, and Dr. Shady. That is in this court's docket, document number 50-2, page 191. That was back in 2012 when they're saying they have no objection to how we disclosed them. So let me ask you this, the medical records. Do the medical records reflect what counsel represented here, that he had had a long history of upper respiratory problem? It does not reflect long history. Six months prior to the incident. Doesn't even necessarily say that. What this record says, review of systems, other review of systems include some rhinitis. That's all it says? That's all it says in the record. In the deposition they ask if he had had, in the deposition she states there was a long history that he had an upper airway problems. Yes, that's in her deposition. The record just says some rhinitis. Right, but she knew that. She knew that he had had a long history, so that's where that language comes from, the deposition. Sure, sure, and in her deposition she isn't regarding that because that's an upper airway problem, and she does say, you know, eventually I guess it could lead to something similar to RADS, but she still by the end of her deposition says, I still think this is RADS tied to chlorine exposure. Her deposition... And does she give a reason as to why she rules, she says that's the primary reason versus these other things? I think primarily it's the 2009, then all of the symptoms he has on that day, and the fact they continue. I mean, it's not just a temporal relationship. And did she articulate that? Like you have, that these are the symptoms? I don't think as neatly, but I think if you read her entire deposition, which in your record would be document 50-5, it starts on page 95, and I'd suggest reading the entirety of the deposition, because we can both pull out that ultimately the summary judgment was improper for multiple reasons that say in our briefs and as stated today. All right. Thank you. Thanks to all counsel. The case is taken under advisement.